ZAVON CO. v. ATLAS GUM SIZING CO., Inc., et al.

No. 6697.

District Court, E. D. New York.

May 10, 1934.

Joseph Nicchia, of New York City (Charles A. Morton, of Brooklyn, N. Y., of counsel), for plaintiff.

Moses & Nolte, of New York City (Frank S. Busser and George J. Harding, both of Philadelphia, Pa., of counsel), for defendants.

GALSTON, District Judge.

This is a patent infringement suit involving patent No. 1,407,297 issued February 21, 1922, to Thomas W. Pritchard. The patent covers a cleaning and scouring compound, and the process for manufacturing it.

Invalidity and noninfringement are urged as defenses.

The patentee states that the essential element of his compound is pine oil, which he describes as: "The oil obtained from resinous pine or fir wood by destructive distillation or by any process by which turpentine is obtained, and is a clear liquid of oily consistency varying in color from white to yellow having an odor somewhat suggestive of freshly cut pine saw-dust having a specific gravity varying from .89 to .95 at 20° C. and a refractive index at 20° C. approximately around 1.4860 and is free from turpentine and also free from any creosote or other products of destructive distillation of the wood."

The inventor thus sought to define a specific variety of pine oil, for he says: "The precise composition of pine oil is somewhat variable and all its constituents are not known to me. Furthermore, in recent years the article sold as pine oil has varied considerably in its composition. I am, therefore, as yet unable to say the precise constituent or constituents of pine oil which give to it the great advantage that I have discovered in the treatment of textiles. In referring herein to pine oil, therefore, I wish to be understood to mean those volatile distillates containing an effective proportion of the essential constituents of pine oil or equivalents thereof."

In describing the process of manufacture, the specification states: "I take one part of neutral vegetable oil soap, such as castile soap and three parts of water and dissolve the soap in the water. I then heat the solution and add gradually the pine oil sufficient to form a gelatinous mixture of about the consistency of table jelly. The amount of pine oil necessary is about two parts to 4 parts of the mixture so that the mixture when complete contains about one part by weight of soap, two parts of pine oil and three parts of water."

All five claims of the patent are in issue. They read:

"1. The herein described cleaning and scouring compound consisting of soap produced from natural fat and alkali, water, and pine oil produced from resinous wood by distillation and free from turpentine."

"2. The herein described cleaning and scouring compound consisting of soap produced from vegetable oil and alkali, water, and pine oil produced from resinous wood by distillation and free from turpentine."

"3. The herein described cleaning and scouring compound consisting of soap pro-

duced from vegetable oil and alkali, water, and pine oil produced from resinous wood by distillation and free from turpentine, combined together to form a colloidal mass."

"4. The herein described cleaning and scouring compound consisting of soap produced from vegetable oil and alkali, water, and pine oil produced from resinous wood by distillation and free from turpentine, in the proportions of one part of soap, three parts of water and two parts of pine oil."

"5. The herein described process of forming a colloidal mass containing pine oil produced from resinous wood by distillation and slightly soluble only in water, which consists in dissolving soap produced from natural fat and alkali in water, heating the solution and gradually introducing the pine oil."

It will be noted that claim 1 defines the compound broadly, without limitation of the percentages of the three ingredients. Claim 2 is somewhat narrower, limiting the natural fat, from which the soap is produced, to vegetable oil. Claim 3 limits claim 2 by referring to the combination as a colloidal mass. Claim 4 defines the proportions of the compound: Soap, one part; water, three parts; pine oil, two parts. Claim 5 is the process claim.

In contending that the patent is invalid, the defendants assert not merely lack of invention, but set forth anticipations in the form of patents, publications, and prior uses.

From these it is reasonably clear that standard commercial pine oil was known in the art long prior to September 24, 1917, the filing date of the application for the patent in suit.

In the patent to Ellis, for example, No. 1,006,736, granted October 24, 1911, it is said: "Pine oil obtained from the long-leaf pine or from other sources, is a desirable disinfectant, particularly when in a finely divided form, such as is effected by means of soap emulsions." No further limitation of the kind of pine oil is set forth.

In British patent, No. 15,643, of 1915 to Farley, for an improved cleansing compound, pine oil is referred to as an ingredient, but with no definition of its essential characteristics.

In the specifications of the United States Navy, issued March 1, 1915, the properties of pine oil for Navy Department use are defined:

"Pine oil must be a properly prepared light straw-colored oil produced by redistillation of heavy, high boiling point fractions

resulting from the steam distillation of wood turpentine, and shall have a strong aromatic odor resembling turpentine. The specific gravity shall be not greater than 0.937 and not less than 0.933 at 60° F.

"(a) One hundred c. c. of the oil when subjected to distillation in the standard Engler distilling flask must yield at least 95 per cent of distillate between the temperatures 375° F. and 475° F."

In an article by J. E. Teeple, published in the Journal of the American Chemical Society in 1908, pine oil is defined as a by-product in the extraction of turpentine by means of steam.

The plaintiff contends that one of the disadvantages of the pine oil in use prior to his invention was the offensive odor of the preparation employed. It is therefore significant, in determining what Teeple meant by pine oil, to note: "When properly refined it has a very pleasant odor which leads to its use by the essential oil trade in general and by soap makers in particular for perfuming cheaper soaps." And he adds: "The commercial long leaf oil, as it comes on the market, is either clear and water white, containing 3 or 4 per cent. of dissolved water, or it may have a very faint yellow color and be free from dissolved water. The specific gravity ranges from 0.935 to 0.947, depending on freedom from lower boiling terpenes. A good commercial product will begin distilling at about 206° to 210° and 75 per cent. of it will distill between the limits 211°–218°, and 50 per cent. of it between 213–217°. A sample having a density of 0.945 at 15.5° showed a specific rotation of about (a) 20°D—II°, and an index of refraction of N/D 1.4830. In fractional distillation of the oil the specific gravity of the various distillates rises regularly with increasing temperature, becoming steady at about 0.947 at 217°."

Pine oil thus described seems reasonably within the range defined by Pritchard. The color is the same. The odor is agreeable. The specific gravity ranges from 0.935 to 0.947 (Pritchard's maximum is .95 at 20° C,) and the index of refraction is stated as 1.4830 as against Pritchard's figure of 1.4860 at 20° C. Moreover, from the proof in the case it appears that a pine oil which begins distilling at 206° to 210° C cannot contain turpentine; nor can a pine oil, of which 75 per cent. distills between the limits of 211–218° and 50 per cent. between 213–217°, contain any substantial proportion of creosote.

Pine oils from steam distillation are also referred to in the Veitch and Donk article published December 12, 1911. The specific gravity of such pine oil, as obtained from steam distillation, is set forth in ranges from 9.8890 to 0.9600; refractive index from 1.475 to 1.500. The distillation is said to begin at 165° to 180° C, and generally complete at from 215 to 240°; the larger quantity of most pine oils distilling between 190° and 225°.

The absence of creosote and tar is referred to, and Donk, a witness in the case, testified that pine oil, at the time of the writing of the article, did not contain either turpentine or creosote.

I conclude, therefore, that pine oil as defined by Pritchard was known as a commercial article prior to the date of his application for letters patent.

■ Claim 1 describes a compound of soap produced from natural fat and alkali, water, and pine oil. The Mackie Pine Products Company, in the year 1915, manufactured and sold a composition containing the following ingredients:

Pine oil, 144 gallons.
Vegetable fat (rosin oil), 16 gallons.
Alkali solution in water (NaOH), 24 gallons.

The Fulton Bag & Cotton Mills, in the year 1915, manufactured and sold a composition consisting of:

Pine oil, 60 per cent.
Rosin soap, 22 per cent.
Water, 18 per cent.

The American Disinfecting Company, Inc., in 1915, manufactured and sold disinfectants consisting of:

Pine oil, 50 gallons.
Corn oil—linseed oil soap, 240 pounds.
Water, 5 gallons.
And another preparation:
Pine oil, 75 pounds.
Rosin, 25 pounds.
Caustic solution (NaOH), 10 pounds.
Water, 1 gallon.

The Midland Chemical Company, also prior to September, 1915, sold a disinfectant consisting of:

Pine oil, 100 gallons.
Soap, 200 pounds.
The soap consisting of:
Corn oil, 135 gallons.
Caustic potash, 760 pounds.
Water, 202½ gallons.

In view of these uses, and since the pine oil defined in claim 1 was in 1915 and prior thereto a commercial standard article, I am of the opinion that claims 1 and 2 are too

broad in scope and are invalid for want of invention.

Taking up now claim 3, the limitation expressed in that claim is that the soap, pine oil, and water are combined to form a "colloidal mass." If there is anything novel in the claim, it must depend upon that limitation.

The patent to Ellis, heretofore referred to, is for a solidified oil. Ellis sought definitely to obtain a "sufficiently solid form so that it can be handled readily, or so as to mingle with water in a satisfactory way." He melted 1 pound of stearic acid, added to it 2 gallons of pine oil, and when that mixture was thoroughly incorporated, added 1 pint of an aqueous solution carrying about 4 ounces of caustic soda. The mixture was churned thoroughly with the pine oil and warmed to 90 degrees C. On cooling, a solid material resulted in which the soap remained largely in the solution in the pine oil "and in setting, causes the desired solidification and renders the pine oil capable of readily emulsifying with water." He says: "With lesser amounts of the stearate, the composition may be made to solidify to a clear transparent solid or jelly. With still smaller amounts, the composition may be liquid carrying gelatinous particles, which, however, is not a satisfactory form, as it is too fluid for convenient handling."

Ellis suggests another composition consisting of 1 part of oleic acid dissolved in 4 parts of pine oil, to which mixture ¼ part of caustic potash dissolved in ½ part of water is added, stirred vigorously and heated to 80 or 90 degrees C. A quantity of sodium stearate or palmitate sufficient to saturate the solution is added and the mixture heated until the soap is dissolved. Ellis says: "The composition is then allowed to cool when it gelatinizes to a stiff jelly, clear and transparent."

The plaintiff contends that the Ellis composition is anhydrous. On the contrary, it is not free from water. He limited the amount for ease in transportation. The composition described by Ellis is a colloidal mass within the meaning of claim 3 of the patent, for it may be noted that claim 3 does not specify the percentage of water to be used.

I find, therefore, that claim 3 is invalid for want of invention and because of anticipation.

The matter of infringement of the remaining claims will now be discussed.

Three compositions made and sold by the defendants are asserted to infringe:

Soap (sodium oleate), 19–20 per cent.
Pine oil, 11–12 per cent.
Moisture (water), 68–70 per cent.

Soap (sodium oleate) 18–20 per cent.
Pine oil, 4–5 per cent.
Moisture (water), 78–75 per cent.

Soap (sodium oleate), 18–20 per cent.
Pine oil, 6 per cent.
Turpentine, 6 per cent.
Butanol, 2 per cent.
Water, 66–68 per cent.

The third of these compositions does not infringe, since apparently turpentine was added deliberately in order to avoid infringement.

Claim 4 is not infringed because there is a substantial variation in the pine oil content. The first of the defendants' compositions contains from 11 to 12 per cent. of pine oil, and the second from 4 to 5 per cent. of pine oil, as against 33⅓ per cent. recited in claim 4. The finding of noninfringement as to claim 4 makes it unnecessary to discuss the question of validity of that claim.

Claim 5 is the process claim.

The defendant Von Zwehl, in cross-examination, was asked how the plaintiff's product, Zavon, was made, and he answered that it was made from red oil, pine oil, caustic soda, and water. The examination then proceeded:

"XQ72. You give me the constituents. How was it made? A. I will give it as far as I would make it.

"XQ73. Yes. A. From the analysis I would take red oil and water, heat it up, add caustic soda and add the pine oil. As far as their method which they had, I never asked them.

"XQ74. Very simple proposition, isn't it? A. Very simple, right.

"XQ75. And that is the way you make it, isn't it? A. It is.

"XQ76. You take red[1] oil and caustic? A. Right.

"XQ77. In solution, and you heat them together? A. Right.

---

[1] Though the witness refers here to "red oil," the stipulation as to the constituents of defendants' product recites the use of sodium oleate, apparently the same substance.

"XQ78. In the proper proportions? A. Right.

"XQ79. And then you take pine oil? A. Right.

"XQ80. Any particular pine oil? A. Hercules Middol Pine Oil.

"XQ81. Hercules, what name? A. Mydol or Middol.

"XQ82. How do you spell that? A. M-i-d-d-o-l. That is one of the brands we have used.

"XQ83. Is that the brand you are using now? A. At the present time, yes."

And he said: "I would take red oil and water, heat it up, add caustic soda, and add the pine oil. As far as their method which they had, I never asked them."

This process certainly falls within the limitation of claim 5 of the patent, although it is true that Von Zwehl did not say, nor was he asked, whether the pine oil was added gradually.

■ So much attention was focused at the trial on the compound that little or no discussion was had of the novelty of the process, nor is the matter argued in the defendant's brief. The lack of novelty of the Pritchard compound would, of course, not negative validity of the process. The specification says: "In preparing the cleaner and scouring compound I take one part of neutral vegetable oil soap, such as castile soap and three parts of water and dissolve the soap in the water. I then heat the solution and add gradually the pine oil sufficient to form a gelatinous mixture of about the consistency of table jelly."

The emphasis is upon the gradual introduction of the pine oil up to the time that the gelatinous mixture is formed. This is exactly the result obtained by the defendants; and hence the addition of the pine oil must have been gradual. At least, the result is not otherwise accounted for.

Plaintiff's expert Alexander's demonstration in court was in this respect convincing. It appears that as more oil is added, the emulsion breaks and a different composition, in appearance at least, is produced. Gelatinization is restored only by the addition of a quantity of soap solution. His demonstration and his explanation of why defendants' witness Pickett failed with Exhibit K convince me that Pritchard defined a patentable process, at least so far as this record discloses.

I conclude that claims 1, 2, and 3 are invalid; that claim 4 is not infringed; and claim 5 is valid and infringed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.